UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MARIO ALEXANDER IXCHOP PEREZ,<br><br>Petitioner,<br><br>v.<br><br>CHAD F. WOLF, et al.,<br><br>Respondents. | Case No.  5:19-cv-05191-EJD<br><br>**ORDER DENYING PETITIONER'S MOTION TO ENFORCE THE COURT'S EARLIER ORDER; GRANTING IN PART PETITIONER'S MOTION FOR A TEMPORARY RESTRAINING ORDER**<br><br>Re: Dkt. No. 15 |

Petitioner Mario Alexander Ixchop Perez, a noncitizen, has been detained by the U.S. Government since January 23, 2018.  On January 23, 2020, this Court granted Petitioner's petition for a writ of habeas corpus and ordered Respondents ("the Government") to (1) present Petitioner for an individual bond hearing and (2) at the hearing, prove by clear and convincing evidence that Petitioner's continued detention is justified.  Petitioner received the ordered bond hearing.  The Immigration Judge ("IJ") determined that Petitioner's continued detention is justified.  Petitioner now argues that the IJ failed to comply with this Court's writ of habeas corpus.  Accordingly, Petitioner has filed two motions: in one he seeks an order to enforce this Court's prior writ of habeas corpus and, in the other, he seeks a temporary restraining order ("TRO").  Having considered the Parties' papers, the Court **DENIES** Petitioner's request to enforce the Court's earlier order but **GRANTS in part** Petitioner's request for a temporary restraining order.[1]

## I. BACKGROUND

### A. Factual Background

Petitioner is a 38-year-old citizen of Guatemala. Order Granting Writ of Habeas Corpus ("Writ") at 1, Dkt. 13. He entered the United States without being inspected, admitted or paroled. *Id.* He has primarily lived in San Francisco since 1996. *Id.* In 2014, he married a U.S. citizen; they have three young children. *Id.* at 2.

Petitioner has a criminal record stemming from alcohol abuse. Between 2009 and 2015, he was arrested and convicted of driving under the influence ("DUI") five times. *Id.*; *see also* Department's Submission of Evidence for Bond Hearing ("Govt. Record") at ECF 20–27, Dkt. 15-2. His first four DUI convictions were misdemeanor offenses; his final DUI conviction was a felony offense. Petitioner's criminal history is as follows:

- Petitioner was first convicted of DUI on September 9, 2009. *See* Govt. Record at ECF 22. According to the criminal complaint, on August 8, 2009, Petitioner was arrested for driving with a blood-alcohol content of .24%, which is three times the legal limit. *Id.* at ECF 29, 32. He was sentenced to 7 days in jail and 3 years of probation. *Id.* at ECF 29.

- Three months later, on December 17, 2009, Petitioner was again convicted of DUI. *Id.* at ECF 23. According to the criminal complaint, on September 7, 2009 (which was two days *before* his first conviction and less than a month after his first DUI arrest), Petitioner was arrested for driving with a blood-alcohol content of .08% or above. *Id.* at ECF 33. The traffic citation also indicates that he was going approximately 92 miles-per-hour in a 65 miles-per-hour zone. *Id.* at ECF 36. He was sentenced to 45 days in jail and 3 years of probation. *Id.* at ECF 23.

- Petitioner did a program for his first two DUIs at the Dry Zone at Mission Council. Declaration of Mario Ixchop Perez ("Perez Decl.") ¶ 10, Dkt. 15-5. There, he completed all but one of the 18 months of classes. *Id.*

- Even after completing the Dry Zone program, three years later, on June 5, 2012, Petitioner was convicted of his third DUI. Govt. Record at ECF 24. According to the criminal complaint, on April 22, 2012, Petitioner was arrested for driving with a blood-alcohol content of .08% or above. *Id.* at ECF 44. He was sentenced to 364 days in jail, all but 15 days suspended, and 3 years of probation. *Id.* at ECF 24.

- Two years later, on August 14, 2014, Petitioner was convicted of his fourth DUI. *Id.* at ECF 24–25. According to the criminal complaint, on December 29, 2013, Petitioner was arrested for driving with a blood-alcohol content of .08% or above. *Id.* at ECF 47. The

without oral argument. *See* Dkt. 22.
Case No.: 5:19-cv-05191-EJD
ORDER DENYING PETITIONER'S MOTION TO ENFORCE THE COURT'S EARLIER ORDER; GRANTING IN PART PETITIONER'S MOTION FOR A TEMPORARY RESTRAINING ORDER

2

police report indicates that Petitioner's wife, Ms. Alexandra Avila, was in the car.  *See* Ex, C. at ECF 3, Dkt. 15-4.  The report reflects that Petitioner's blood-alcohol content was .13%.  *Id.* at ECF 11.  Petitioner was sentenced to 20 days in jail and 3 years of probation. Govt. Record at ECF 25.

- Finally, on June 15, 2016, Petitioner was convicted of his fifth DUI.  *Id.* at ECF 25. According to the criminal complaint, on October 18, 2015, Petitioner was arrested for driving with a blood-alcohol content of .08% or above.  *Id.* at ECF 49.  He was sentenced to 1 year in jail, all but 196 days suspended, and 5 years of probation.  *Id.* at ECF 26.

Petitioner contends that he has been sober since his 2015 arrest.  Writ at 2; *see also* Perez Decl. ¶ 17.  On May 17, 2016,[2] Petitioner was released from jail following his felony-DUI conviction.  Perez Decl. ¶ 17.  Following his release, Petitioner again enrolled in the Dry Zone DUI Program at the Mission Council on Alcohol Abuse.  *Id.* ¶ 18.  The director of the program represented in a letter dated February 20, 2018, that Petitioner's progress and prognosis were both "good" and that he had a tentative discharge date of January 23, 2019.  Writ Order at 2.

Following Petitioner's fourth DUI, in April 2014, Immigration and Customs Enforcement ("ICE") arrested Petitioner and began removal proceedings.  *Id.*  Petitioner was released that same day on a $1,500 bond.  *Id.*  Following his fifth DUI, on January 23, 2018, ICE officers arrested Petitioner after they determined that he had violated the conditions of his release on bond and that he posed a danger to the public.  *Id.*  Pursuant to 8 U.S.C. § 1226(a), Petitioner has remained in custody.  He was initially detained at the West Contra Costa County Jail in Richmond, California. While there, he graduated from Phases I & II of the Deciding, Educating, Understanding, Counseling, and Evaluation ("DEUCE") substance abuse program.  Perez Decl. ¶ 27.  He also participated in the Men and Woman of Purpose self-help rehabilitation service.  Writ Order at 2. Subsequently, he was transferred to Denver Contract Detention Facility in Aurora, Colorado. Before the transfer, he was only one class session short of graduating from the third and final phase of DEUCE.  Writ Order at 2; Perez Decl. ¶ 27.

---

[2] There is ambiguity as to when Petitioner was actually released from jail following his fifth DUI. The record indicates that he was convicted of his fifth DUI in June 2016 and sentenced to a year in jail with all but 196 days suspended.  Yet, he alleges that he was released from jail on May 17, 2016.

Case No.: 5:19-cv-05191-EJD
ORDER DENYING PETITIONER'S MOTION TO ENFORCE THE COURT'S EARLIER ORDER; GRANTING IN PART PETITIONER'S MOTION FOR A TEMPORARY RESTRAINING ORDER

**B. Procedural History**

On January 29, 2018, Petitioner appeared for a bond hearing pursuant to 8 U.S.C. § 1226(a).  The IJ issued an order that, in relevant part, placed the burden on Petitioner to show that he is neither a danger to the community nor a flight risk.[3]  On January 23, 2020, the Court held that this violated Due Process and granted Petitioner's habeas corpus petition.  *See* Writ at 7–10.  The Court ordered the Government to present Petitioner for another individual bond hearing and instructed the Government that at this bond hearing, it would bear the burden of proving by clear and convincing evidence that Petitioner's continued detention is justified.  *Id.* at 11.

On January 31, 2020, the Immigration Court held a custody redetermination hearing.  *See* Decision of the Immigration Judge ("IJ Decision") at ECF 2, Dkt. 15-7.  The Government submitted evidence about Petitioner's past five DUI's, his arrest records, and prior bond-hearing history.  It also submitted several studies relating to driving under the influence, which indicate that less than 1% of DUI offenses are even detected and that persons who drive under the influence have a high rate of reoffending.

Petitioner submitted evidence supporting his release on bond.  He filed documents that included a declaration from himself, a declaration from his wife, their marriage certificate, his children's birth certificates, proof of residence and financial hardship to his wife, additional letters of support from friends and family, a Criminal History Chart, a Notice to Obligor to Deliver Alien, a Psychological evaluation by Dr. Salvador-Moses, a letter from Mission Council on Alcohol Abuse, a Letter from Petitioner's probation officer, proof of participation in DEUCE, proof of participation in Men and Women of Purpose, proof of participation in educational programing in ICE detention, and letter of acceptance for Secure Continuous Remote Alcohol Monitor ("SCRAM") and related materials.  The psychological evaluation by Dr. Salvador-Moses indicates that Petitioner has a low possibility of reoffending.  Ex. I ("Salvador-Moses Report"), Dkt. 15-5.

---

[3] The Government does not argue that Petitioner is a flight risk.  The Parties seem to agree that he is *not* a flight risk.

1   Petitioner also submitted a letter of acceptance to an outpatient program, family photos, additional

2   letters of support, and a Bond Release Plan.  The Release Plan was developed by licensed social

3   worker Edith Castellon and concludes that outpatient treatment is appropriate and that Petitioner's

4   strong commitment to sobriety shows that he is very likely to maintain his sobriety.  *See* Ex. A,

5   ("Castellon Letter"), Dkt. 15-6.

6          Subsequently, on February 2, 2020, the IJ issued a written decision denying Petitioner's

7   request to be released on bond.  *See* IJ Decision at 3.  The IJ concluded, based on Petitioner's

8   arrest record, that the Government has demonstrated by clear and convincing evidence that

9   Petitioner poses a danger to the community.  *Id.*  Petitioner appealed to the Board of Immigration

10  Appeals ("BIA").  Along with appealing to the BIA, Petitioner filed this action on the grounds that

11  the IJ's order violates this Court's earlier writ of habeas corpus.  Specifically, in Petitioner' view,

12  because a bond appeal takes "months to resolve," this Court should grant him equitable relief and

13  either order the Government to (1) release him from ICE custody or (2) provide him another bond

14  hearing.  *See* Memorandum of Points and Authorities in Support of Motion to Enforce Prior Order

15  and Motion for Temporary Restraining Order ("TRO Mot."), Dkt. 16.  Beyond challenging the

16  IJ's bond determination, Petitioner also argues that the novel coronavirus disease (COVID-19)

17  pandemic is cause to order him temporarily released.  The Government opposes this motion and

18  argues that this Court lacks the ability to disrupt the IJ's discretionary decision and that the

19  COVID-19 pandemic is not presently a risk in the Aurora Detention Facility.  *See* Respondents'

20  Opposition to Petitioner's Motion to Enforce Judgment and Motion for Temporary Restraining

21  Order ("Opp."), Dkt. 24.  On April 2, 2020, Petitioner filed a reply.  Petitioner's Reply to

22  Respondent's Opposition ("Reply"), Dkt. 25.

23  **II.      DISCUSSION**

24         Petitioner presents two motions to the court.  First, Petitioner moves for an order from this

25  Court to compel the Government to comply with this Court's January 2020 Writ of Habeas

26  Corpus.  In the event the Court finds that the IJ failed to comply with the January 2020 Writ of

27  Case No.: 5:19-cv-05191-EJD
    ORDER DENYING PETITIONER'S MOTION TO ENFORCE THE COURT'S EARLIER
28  ORDER; GRANTING IN PART PETITIONER'S MOTION FOR A TEMPORARY
    RESTRAINING ORDER

Habeas Corpus, Petitioner seeks a TRO that would either force the Government to release him on bond or that would require the Government to re-do the bond hearing. In the alternative, Petitioner seeks an order temporarily releasing him pursuant to the Coronavirus (COVID-19) pandemic. The Court addresses these motions in turn.

### A. Motion to Enforce This Court's January 2020 Writ of Habeas Corpus

#### 1. Jurisdiction

The Government first argues that this Court lacks jurisdiction under 8 U.S.C. § 1226(e) because the IJ's decision to deny Petitioner bond was discretionary and thus is not subject to judicial review. Opp. at 6.

A district court's jurisdiction to review an IJ's decision is limited by section 1226(e), which states:

> Judicial Review. The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole.

While it is true that section 1226(e) prevents a federal court from reviewing an IJ's discretionary bond determination, the Supreme Court, and courts in this district, have noted that section 1226(e) does not "limit habeas jurisdiction over constitutional claims or questions of law." *Singh*, 638 F.3d at 1202; *see also Ramos v. Sessions*, 293 F. Supp. 3d 1021, 1025 (N.D. Cal. 2018). Section 1226(e) precludes jurisdiction over a claim that an IJ, exercising his statutorily-delegated discretion, "set an excessively high bond amount." *Prieto-Romero*, 534 F.3d at 1067. But, claims that the bond process was *itself* flawed are cognizable in federal court. *Hernandez v. Sessions*, 872 F.3d 976, 987 (9th Cir. 2017). Of course, a habeas petitioner may not circumvent clear congressional intent to eliminate judicial review over discretionary decisions by "cloaking an abuse of discretion argument in constitutional garb." *Torres-Aguilar v. INS*, 246 F.3d 1267, 1271 (9th Cir. 2001) ("To determine whether we have jurisdiction over claims labeled as due process

Case No.: 5:19-cv-05191-EJD
ORDER DENYING PETITIONER'S MOTION TO ENFORCE THE COURT'S EARLIER ORDER; GRANTING IN PART PETITIONER'S MOTION FOR A TEMPORARY RESTRAINING ORDER

6

violations, we must look beyond the label.").

The Government argues that Petitioner has failed to state a colorable constitutional violation. Opp. at 8. To be "colorable," the alleged violation need not be "substantial;" rather, the claim must only have "some possible validity." *Id.* (quotation marks and citation omitted). In this case, Petitioner has stated a colorable due process claim. He, like the petitioner in *Singh*, challenges the constitutionality of the standard of proof applied at his bond hearing. *See Hernandez*, 872 F.3d at 988. In other words, he argues that because the Government failed to meet its evidentiary burden, the IJ's discretionary decision itself was constitutionally flawed. *See* TRO Mot. at 8–9; *cf. Slim v. Nielson*, 2018 WL 4110551, at *5 (N.D. Cal. Aug. 29, 2018) (holding that the court lacked jurisdiction to review the petitioner's habeas claim because the petitioner did not "challenge the fairness of the bond hearing itself" but instead argued that the IJ erred in weighing the evidence and disagreed with the outcome of the bond process). Petitioner thus makes a colorable due process argument, which the Court has jurisdiction to review. *See Hernandez*, 872 F.3d at 988; *Ramos*, 293 F. Supp. 3d at 1028; *Jimenez v. Wolf*, 2020 WL 1082648, at *2 (N.D. Cal. Mar. 6, 2020).

### 2. Exhaustion

The Government next argues that the Petitioner's motion should be denied because Petitioner did not administratively exhaust his claim. Opp. at 17.

28 U.S.C. § 2241, the statute under which Petitioner filed his habeas petition, "does not specifically require petitioners to exhaust direct appeals before filing petitions for habeas corpus." *Laing*, 370 F.3d at 997 (quotation marks and citation omitted). As a prudential matter, however, habeas petitioners must exhaust available judicial remedies before seeking relief under section 2241. *Id.* Notably, prudential limits, like jurisdictional limits, "are ordinarily not optional." *Castro-Cortez v. INS*, 239 F.3d 1037, 1047 (9th Cir. 2001), *overruled on other grounds by Fernandez v. Gonzales*, 548 U.S. 30 (2006). Accordingly, "[l]ower courts are, . . . not free to address the underlying merits without first determining [whether] the exhaustion requirement has

Case No.: 5:19-cv-05191-EJD
ORDER DENYING PETITIONER'S MOTION TO ENFORCE THE COURT'S EARLIER ORDER; GRANTING IN PART PETITIONER'S MOTION FOR A TEMPORARY RESTRAINING ORDER

7

been satisfied or properly weighed." *Laing*, 370 F.3d at 998.

The Parties do not despite that Petitioner has failed to exhaust his direct appeals. As noted, Petitioner's BIA appeal has neither been fully briefed nor heard. TRO Mot. at 6; Opp. at 3. Instead, Petitioner argues that he need not exhaust his direct appeal. In the alternative, he contends that exhaustion should be waived in this case.

The Court does not agree that Petitioner *per se* need not exhaust his direct appeals. In support of this argument, Petitioner cites *Ramos*, which holds that a detainee-petitioner need not administratively exhaust an IJ's decision if the petitioner is simply trying to enforce the court's earlier order. To support this reasoning, *Ramos* relies on *Harvest v. Castro*, 520 F.3d 1055 (9th Cir. 2008), *amended and superseded by* 531 F.3d 737 (9th Cir. 2008), *Mau v. Chertoff*, 562 F. Supp. 2d 1107 (S.D. Cal. 2008), *Judulang v. Chertoff*, 562 F. Supp. 2d 1119 (S.D. Cal. 2008), and *Sales v. Johnson*, 2017 WL 6855827 (N.D. Cal. Sept. 20, 2017). Both *Mau* and *Judulang* support their analysis with *Harvest*; *Sales* finds that exhaustion was not required because the government cited no precedent saying that a petitioner seeking to enforce a court's earlier order must exhaust available direct appeals.

The Court notes an issue with *Ramos*' application of *Harvest*—the *Ramos* court failed to address the portion of the *Harvest* opinion that requires district courts to follow statutes, rules, and precedents when enforcing prior equity-based orders. *Harvest* states that while "a district court can modify its conditional writ . . . [and] has continuing jurisdiction over [the writ]," it may not "ignore . . . statutes, rules, and precedents." *Harvest*, 531 F.3d at 745 (quotation marks and citations omitted) (second alteration in original).

As noted, the Ninth Circuit has made clear that "[l]ower courts are, . . . not free to address the underlying merits [of a habeas action] without first determining [whether] the exhaustion requirement has been satisfied." *Laing*, 370 F.3d at 998. Hence, here, where Petitioner's claim is based on 28 U.S.C. § 2241, precedent requires exhaustion. In other words, because habeas jurisdiction forms this Court's ability to even hear Petitioner's motion, the Court must comply

with the applicable precedent that requires a petitioner to either exhaust available direct appeals or show that they are excused from exhaustion. The Court is hesitant to join other courts in carving-out a "prior order" exception to the exhaustion rule without a clearer indication from the Ninth Circuit that such an exception is appropriate. Accordingly, unlike *Ramos*, *Mau*, *Judulang*, and *Sales*, this Court holds that a petitioner seeking to enforce an earlier writ of habeas corpus must still exhaust (or be excused from exhausting) available direct appeals.

In the alternative, Petitioner argues that he is excused from exhausting available administrative appeals. As noted, for habeas claims, the exhaustion requirement is prudential rather than jurisdiction. *Singh*, 638 F.3d at 1203 n.3. Prudential exhaustion may be required when: (1) agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision;(2) relaxation of the requirement would encourage the deliberate bypass of the administrative scheme; and (3) administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review. *Hernandez*, 872 F.3d at 988. If a petitioner fails to exhaust prudentially required administrative remedies, then "a district court ordinarily should either dismiss the petition without prejudice or stay the proceedings until the petitioner has exhausted remedies." *Leonardo v. Crawford*, 646 F.3d 1157, 1160 (9th Cir. 2011). A court may waive the prudential exhaustion requirement if "administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void." *Laing v. Ashcroft*, 370 F.3d 994, 1000 (9th Cir. 2004) (quotation marks and citation omitted).

Petitioner must show that at least one of the *Laing* factors applies in order to excuse exhaustion. *See Ortega-Rangel v. Sessions*, 313 F. Supp. 3d 993, 1003 (N.D. Cal. 2018). Petitioner has done so here by demonstrating futility and irreparable harm. Regarding futility, the Parties have provided the documents and evidence considered by the IJ in the custody redetermination hearing. *See* Dkt. 15. This Court need not make factual findings; it need only answer the legal question of whether the IJ applied and the Government met the proper burden of

1    proof at the bond hearing.  *See Hernandez*, 872 F.4d at 989 ("[A]n administrative appellate record

2    is not necessary to resolve the purely legal questions presented by Plaintiffs' challenge . . . .").

3           Regarding irreparable harm, Petitioner has been detained for over two years.  If Petitioner

4    is correct on the merits of this habeas petition, *i.e.*, if he is correct that his <u>second</u> bond hearing

5    *again* violated due process, then he has been unlawfully deprived of a bond hearing for over two

6    years.  *See supra* I.B. (noting in the procedural history section that Petitioner's first bond hearing

7    was on January 29, 2018 and noting that this bond hearing formed the basis of Petitioner's first

8    habeas petition).  Even assuming the Government is correct that Petitioner's BIA appeal will take

9    two months, see Opp. at 19, these two months, coupled with his already two-year detention, still

10   present irreparable harm as it is possible Petitioner is being held unlawfully.  *See Villata v.*

11   *Session*, 2017 WL 4355182, at *3 (N.D. Cal. Oct. 2, 2017).  Moreover, given the ongoing

12   COVID-19 pandemic, it seems especially unlikely that Petitioner's BIA appeal will be resolved

13   within two months, which risks subjecting Petitioner to continued unlawful detention and an

14   increased risk of contracting the virus.  Accordingly, the Court holds that the requirement of

15   exhaustion is excused.

16                  **3.    Standard of Dangerousness That Must Be Met to Deny Bond**

17          At a bond hearing, to justify denial of bond and continued detention, due process requires

18   the Government to prove by clear and convincing evidence that an immigrant is a flight risk or a

19   danger to the community.  *Singh*, 638 F.3d at 1203 (citing the "substantial liberty interest at

20   stake"); *see also Obregon v. Sessions*, 2017 WL 1407889, at *7 (N.D. Cal. Apr. 20, 2017) ("Case

21   law demonstrates that establishing dangerousness by 'clear and convincing evidence' is a high

22   burden . . . .").  To determine whether an immigrant who is detained under section 1226(a)

23   presents a flight risk or danger to the community, IJs "look to a number of factors," like:

24                  (1) whether the immigrant has a fixed address in the United States;
                    (2) the immigrant's length of residence in the United States; (3) the
25                  immigrant's family ties in the United States, (4) the immigrant's
                    employment history, (5) the immigrant's record of appearance in
26                  court, (6) the immigrant's criminal record, including the

27   Case No.: 5:19-cv-05191-EJD
     ORDER DENYING PETITIONER'S MOTION TO ENFORCE THE COURT'S EARLIER
28   ORDER; GRANTING IN PART PETITIONER'S MOTION FOR A TEMPORARY
     RESTRAINING ORDER

United States District Court
Northern District of California

> extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses, (7) the immigrant's history of immigration violations; (8) any attempts by the immigrant to flee prosecution or otherwise escape from authorities; and (9) the immigrant's manner of entry to the United States.

*Matter of Guerra*, 24 I & N Dec. 37, 40 (BIA 2006); *see also Singh*, 638 F.3d at 1206 ("In *Prieto-Romero* we explained that, to determine whether aliens . . . who are detained under § 1226(a) present a 'flight risk or danger to the community,' immigration judges 'should . . . look[] to the factors set forth at *Matter of Guerra*.'" (citation omitted) (alteration in original)).

These factors make clear that an IJ may consider an immigrant's "criminal record, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses." *Obregon*, 2017 WL 1407889, at *6 (quoting *Matter of Guerra*, 24 I & N Dec. at 40; *accord Singh*, 638 F.3d at 1206 ("Although an alien's criminal record is surely relevant to a bond assessment, *Guerra* contemplates that criminal history alone will not always be sufficient to justify denial of bond on the basis of dangerousness. Rather, the recency and severity of the offenses must be considered."); *Casas-Castrillon v. DHS*, 535 F.3d 942, 949 (9th Cir. 2008) (requiring individualized bond hearings to ensure the "government's purported interest" in securing the alien's presence at removal and protecting the community from danger is "*actually* served by detention"). This is to say, a criminal offense alone may not be enough to conclusively establish that an immigrant presents a danger to the community. *Singh*, 638 F.3d at 1206. Rather, the gravity of the offense, when the offense occurred, and what the immigrant has done since the offense are all factors the IJ must consider when determining whether the Government has met its "clear and convincing" burden.

### 4. Analysis of the Alleged Due Process Violation

As noted, Petitioner argues that his bond hearing was constitutionally inadequate because the Government failed to produce enough evidence that clearly and convincingly showed that Petitioner is a danger to the community and so the IJ erred by ruling that Petitioner represents a danger to the community. TRO Mot. at 8. Petitioner further argues that the IJ made constitutional

errors by mischaracterizing the facts, failing to weigh the passage of time since the five DUIs, failing to give Petitioner's rehabilitation evidence sufficient weight, failing to consider probative evidence, and failing to consider alternatives to detention. *Id.* at 8–19.

The "clear and convincing" evidentiary standard is a "high burden." *Obregon*, 2017 WL 1407889, at *7. As relevant here, a history of DUI violations can meet this high standard. *See id.*; *see also Castaneda v. Aitken*, 2015 WL 3882755, at *7 (N.D. Cal. June 23, 2015) (upholding the IJ's determination that the petitioner was a danger to the community where the petitioner had committed two DUIs [one in 2010 and one in 2013] and, during one, swerved into oncoming traffic, despite family letters of support because those supporters were not able to prevent him "from driving on public roads while severely impaired by alcohol" in 2010 and 2013); *Hernandez v. Lynch*, 2016 WL 3406157, at *3 (S.D. Cal. June 20, 2016) (holding that IJ's determination that the petitioner was a danger to the community was supported by clear and convincing evidence because of the petitioner's three DUI convictions, one in 2001, another in 2004, and the last in 2012). As noted above, however, IJs must also consider the remoteness of the DUI and intervening events that might undermine a finding of dangerousness. *See Obregon*, 2017 WL 1407889, at *7 (collecting cases). It is thus not constitutional error for an IJ to base their decision on the petitioner's criminal record, so long as the IJ analyzes the recency of the crimes and what (if any) actions the petitioner has taken to rehabilitate themselves.

### a. Context and Circumstances of Petitioner's Criminal Record

Petitioner first argues that the IJ failed to consider the context and circumstances of his criminal record as required. He starts with the IJ's alleged failure to consider his sobriety and rehabilitation efforts. TRO Mot. at 10–14. Specifically, Petitioner maintains that the IJ did not "meaningfully contend with the impact of [his] extensive rehabilitation." *Id.* at 14. The IJ, however, did consider Petitioner's rehabilitation efforts. *See* IJ Decision at 3 (noting and commending Petitioner on "his current sobriety and his ongoing efforts to remain sober"). Indeed, the IJ noted that even while Petitioner had engaged in rehabilitation efforts in the past, he

continued to reoffend.  *See id.* ("Even so, after four separate convictions, [Petitioner] continued to drink and drive—despite enduring jail time, fines, and multiple court-ordered programs.").  By Petitioner's own admission, he completed almost all of an 18-month "Dry Zone" program at Mission Counsel after his first two DUI convictions.  Perez Decl. ¶ 10.  And, after his next two DUIs, he continued to do the "Dry Zone."  *Id.* ¶¶ 12–14.  Hence, before his last DUI, Petitioner had completed two rounds of the Dry Zone program.  But, regrettably, this program did not stop him from reoffending for a *fifth* time.  Indeed, despite this "influential" program, which "made a huge difference" on Petitioner's life and caused him to reach a "turning point" in 2014, he committed his fifth DUI.  *Id.* ¶¶ 14–16.  This is to say, even while the Petitioner's attempts at sobriety are commendable, there is sufficient analysis and evidence in the record to support the IJ's decision that, despite Petitioner's rehabilitation efforts, he still presents a danger to the community.

Second, and relatedly, Petitioner argues that the IJ did not "meaningfully consider" the "four-and-a-half-years" that have passed since Petitioner's last DUI.  TRO Mot. at 12.  In Petitioner's view, the IJ cannot simply focus on Petitioner's behavior between 2009 and 2015.  Rather, the IJ must consider the length of time since the last offense.  The Court does not dispute that the IJ "must consider the remoteness of the DUI."  *See, e.g.*, *Obregon*, 2017 WL 1407889, at *7.  However, as the IJ noted, while Petitioner's 2015 DUI may have been four-and-a-half years ago, Petitioner has only been "free" for approximately 20 months of that period.  *See supra* (noting that Petitioner was released from jail on May 17, 2016 and that he was detained by ICE on January 23, 2018).  By contrast, Petitioner went over two-and-a-half years between his second and third arrests, twenty months between his third and fourth arrests, and nearly 22 months between his fourth and fifth arrests.  This, the IJ found, particularly concerning.  *See* IJ Decision at 2 ("More troubling, however, is the temporal nature and underlying circumstances of the respondent's DUIs.").  As discussed by the IJ, these multi-year periods between arrests are concerning because they discount the significance of the four-and-a-half years that have passed

since Petitioner's fifth DUI conviction.  *See id.* at 3 ("The Court acknowledges that it has been years since [Petitioner's last DUI.  Even so, after four separate convictions, [Petitioner] continued to drink and drive—despite enduring jail time, finds, and multiple court-ordered programs.  His record demonstrates that even after going multiple years without any arrests, he reoffended in the same manner, showing his propensity towards dangerous conduct.").[4]  The IJ thus did consider the length of time since Petitioner's fifth DUI.

Third, Petitioner argues that DUIs cannot form the basis of a dangerousness determination.  He contends that other courts "have declined to find that a DUI offense, or even multiple DUIs, can justify prolonged detention where the person has a strong record of rehabilitation and significant time sober."  TRO Mot. at 10.  In support, he cites *Mau*, *Ramos*, and *Judulang*.  These cases, however, are distinct.

In *Mau*, the IJ found that a petitioner who had been detained for three years posed a danger to the community based on three DUI convictions (two were misdemeanors, one was a felony) that were four to six years old.  562 F. Supp. 2d at 1116, 1118.  The district court held that while the petitioner's past DUI convictions were serious, they alone could not meet the government's burden to show present and future dangerousness.  *Id.* at 1118.  The court based this holding on the length of detention (which was longer than the time the petitioner had received for his DUI crimes), the petitioner's history of non-violent conduct, and his consistent record of institutional compliance.  *Id.*

---

[4] As support, the IJ cited the Government's submission of studies that highlight the recidivism rates for DUI offenses.  During the hearing, the IJ asked if Petitioner had an objection to these studies.  Petitioner stated that he had "no objection."  *See* Declaration of Pamela T. Johann ("Johann Decl.") at 3:15, 4:13, Dkt. 24-3.  Now, however, Petitioner argues this evidence was received in error because the studies are "irrelevant" and "outdated."  But, the persuasiveness of the evidence goes to how much, or how little, it should be weighed.  Discretionary determinations like how to weigh evidence are beyond this Court's reach.  *See* 8 U.S.C. § 1226(e); *see also Calmo*, 2018 WL 2938628, at *4 (holding that where the evidence is undisputed, "differences in interpretation of the facts" remain "well within the province of the immigration judge"); *cf. Ramos*, 293 F. Supp. at 1035 (analyzing the effect of an IJ misunderstanding evidence).  Accordingly, it was not constitutional error for the IJ to rely on these studies.

In *Judulang*, the IJ found that the petitioner, who had been in immigration custody for five years, was a present danger based on a twenty-year-old conviction for voluntary manslaughter, a seven-year-old conviction for DUI, and a five-year-old conviction for theft.  562 F. Supp. 2d at 1127.  The district court held that "[w]here Petitioner's only relevant conviction for violence is nearly 20-years-old and no other evidence was put forward, the IJ's finding of present dangerousness was an error of law and the denial of bond was inappropriate." *Id.*

Finally, in *Ramos*, the IJ found that the petitioner was a "danger to the community" based on two recent DUIs, the most recent being sixteen months before the IJ's order.  293 F. Supp. 3d at 1024–25.  The district court disagreed with the IJ's assessment and held that the Government had not meet its clear and convincing burden. *Id.* at 1036–37.  The court determined that the "IJ overemphasized the seriousness of [the petitioner's] crimes and . . . gave unduly short shrift to her rehabilitation efforts. *Id.* at 1037.

These three cases share a commonality.  In each, the petitioners had either three DUIs or less. *See Mau*, 562 F. Supp. 2d at 1116 (three DUIs that were four to six years old); *Judulang*, 562 F. Supp. 2d at 1127 (one seven-year-old DUI); *Ramos*, 293 F. Supp. 3d at 1024 (two recent DUIs).  In contrast, in this case, Petitioner has a history of <u>five</u> DUIs, which span across several years.  As the Government notes, the "three DUI" distinction has significant legal implications.  California law recognizes the significance of four or more DUI convictions that occur within the span of ten years. *See* Cal. Veh. Code 23550 (setting forth enhanced penalties for repeat offenders with three or more prior DUI convictions).

Moreover, unlike the petitioners in *Mua*, *Judulang*, and *Ramos*, here, Petitioner's blood alcohol content was almost twice the legal limit in *four out of five* DUI convictions. *See supra* I.A. (noting that Petitioner's blood alcohol content was .24% at the time of his first DUI arrest and .13% at his fifth arrest); *see also* IJ Decision at 2–3 (discussing the Government's evidence which showed Petitioner's high blood alcohol content at four of the five arrests).  This repetitive history of driving with an extremely high blood alcohol content is different from *Mua* and *Judulang*,

Case No.: 5:19-cv-05191-EJD
ORDER DENYING PETITIONER'S MOTION TO ENFORCE THE COURT'S EARLIER ORDER; GRANTING IN PART PETITIONER'S MOTION FOR A TEMPORARY RESTRAINING ORDER

where no mention of blood-alcohol content was made (and thus not a part of the Government's clear and convincing evidence) and *Ramos*, where the court merely noted in passing that the petitioner's "blood alcohol was high." Likewise, unlike the petitioners in *Mua*, *Judulang*, and *Ramos*, the record reflects that at his second DUI, Petitioner also was excessively speeding and at his fourth DUI, had his wife in the car. Hence, Petitioner's criminal record reflects not only that he has driven under the influence, but that he has done so in ways that create an even greater risk to society. Accordingly, because the nature and circumstances of Petitioner's DUIs are different than the petitioners in *Mua*, *Judulang*, and *Ramos*, Petitioner's DUI history *could* support a finding that Petitioner represents a danger to the community. *See Singh*, 638 at 1206 (noting that the IJ must consider "the severity of [any past] offenses").[5]

### b. Consideration of all the Evidence and Arguments

Petitioner next argues that the IJ failed to consider all the evidence and arguments presented at the hearing. In Petitioner's view, the IJ made constitutional errors by not discussing the bond release plan or Petitioner's psychologist's conclusion in her written order. TRO Mot. at 16.

The IJ, however, explicitly stated during the hearing that she would consider all of the evidence and took the matter under submission to further consider the evidence. *See* Johann Decl. at 10:13 ("I have read everything that [the witnesses] have prepared and submitted to the court."); *Id.* at 36:30 ("I want to take into consideration the multitude of documents."); *Id.* at 37:00 ("In order to be fair and issue the most fair decision possible, I'm going to issue a written decision after considering all of the evidence again."). The fact that the IJ did not mention the evidence specifically in her decision does not overcome the presumption that the IJ satisfied the due process requirement to consider such evidence. *See Larita-Martinez v. INS*, 220 F.3d 1092, 1096 (9th Cir. 2000); *see also Cole v. Holder*, 659 F.3d 762, 771 (9th Cir. 2011) ("That is not to say that [the IJ]

---

[5] The Court notes that the IJ relied on these facts to support her analysis that Petitioner's DUI history shows why he represents a danger to the community.

must discuss each piece of evidence submitted.  When nothing in the record or the [IJ's] decision indicates a failure to consider all the evidence, a general statement that [the IJ] considered all the evidence . . . may be sufficient." (quotation marks and citation omitted)).

Only "potentially dispositive testimony and documentary evidence" must be specifically addressed.  *Cole*, 659 F.3d at 772.  Here, no dispositive evidence required further discussion.  As the IJ concluded in her decision, Petitioner's past indicates a high risk of reoffending.  This stands in conflict with the bond release plan and the psychologist's assessment.  The IJ thus rejected the psychologist's interpretation and the bond release plan.  Petitioner argues that "no adverse credibility finding" was made.  *See* Reply at 13.  But, the contrary is true.  The psychologist and Ms. Castellon opine that Petitioner is not a danger to the community because he is unlikely to reoffend.  This stands in tension with the IJ's opinion that the Petitioner's DUI history shows he *is* likely to reoffend.  Hence, inherent in the IJ's order is a conclusion that the Petitioner's evidence was not as convincing as the Government's evidence.  This, coupled with the IJ's statements at the bond hearing that she would consider all the evidence indicates that the IJ considered all the evidence.

### c.   Need to Consider "Alternatives to Detention"

Petitioner last argues that the IJ failed to consider "alternatives to detention," like the option of using the SCRAM remote alcohol monitoring program.  TRO Mot. at 19; *see also id.* at 9 (arguing that due process requires consideration of alternative conditions to release).  Under Ninth Circuit precedent, however, an IJ need only consider "alternative conditions to release" once the IJ determines that the detainee is "neither dangerous nor so great a flight risk as to require detention without bond."  *Hernandez v. Sessions*, 872 F.3d 976, 991 (9th Cir. 2017); *see also Hernandez v. Lynch*, 2016 WL 7116611, at *5 (C.D. Cal. Nov. 10, 2016) ("At [initial bond hearings], Immigration Judges are required to consider alternatives to detention *when setting bond amounts*." (emphasis added)).  Because the IJ determined that Petitioner poses a danger to the community and that bond is inappropriate, the IJ did not need to consider alternatives to detention.

Case No.: 5:19-cv-05191-EJD
ORDER DENYING PETITIONER'S MOTION TO ENFORCE THE COURT'S EARLIER ORDER; GRANTING IN PART PETITIONER'S MOTION FOR A TEMPORARY RESTRAINING ORDER

To the extent Petitioner argues that IJ's failure to discuss the SCRAM remote alcohol monitoring program in her order shows that the IJ failed to consider probative evidence of non-dangerousness, the Court notes that at the hearing the IJ engaged in a discussion about the SCRAM program with Petitioner's counsel. *See* Johann Decl. at 32:52–34:00. Thus, the SCRAM evidence was considered.

Accordingly, the Government showed by clear and convincing evidence that Petitioner represents a danger to the community. After considering Petitioner's criminal history, "the remoteness of the DUI and intervening events that might undermine a finding of dangerousness," and other probative evidence, the IJ determined that Petitioner represented a danger to the community. This is constitutionally proper. To the extent Petitioner argues that the weight of the evidence does not support the IJ's finding, that argument is outside habeas jurisdiction. *See* TRO Mot. at 11 ("The IJ mischaracterized the facts and does not properly *weigh* the passage of time" (emphasis added)); *Id.* at 14 ("The IJ failed to appropriately *weigh* the passage of time as a factor against [Petitioner's] dangerousness." (emphasis added)); *Id.* ("IJ fails to give evidence of rehabilitation sufficient *weight*" (emphasis added)). The Court lacks the ability to "second-guess the immigration judge's weighing of the evidence." *Calmo*, 2018 WL 2938628, at \*4. This Court's review is limited to determining whether or not there is sufficient evidence in the record to support the IJ's dangerousness finding. Whether the Court agrees with that finding is irrelevant. Because sufficient evidence supports the IJ's conclusion, the Court **DENIES** Petitioner's motion to enforce the Court's earlier order.[6]

### b. Motion for a Temporary Restraining Order re COVID-19 Concerns

In the alternative, Petitioner seeks an order that would require ICE to temporarily release him from the Aurora Detention Facility. *See* Reply at 3. Petitioner argues that because of the

---

[6] For this reason, the Court does not reach the TRO portion of Petitioner's motion. The Court instead discusses whether or not Petitioner should be released temporarily pursuant to COVID-19 concerns. *See* TRO Mot. at 23; Reply at 14.

COVID-19 pandemic, the Court should grant him a temporary restraining order that would enable him to shelter-in-place with his family in San Francisco.[7] The Government objects and argues that the Aurora Detention Facility is taking effective precautions to prevent the spread of COVID-19 in its facilities. Opp. at 20–21. Important to the Court's analysis is the unrebutted medical evidence that Petitioner suffers from asthma (which he requires an inhaler for), hypertension, and latent tuberculosis. *See* Dkt. 15-10.

A TRO is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Rovio Entm't Ltd. v. Royal Plush Toys, Inc.*, 907 F. Supp. 2d 1086, 1093 (N.D. Cal. 2012) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008)); *see also Thakker v. Doll*, 2020 WL 1671563, at *3 (M.D. Pa. Mar. 31, 2020) ("The Supreme Court has emphasized that 'a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). The standard for a TRO is the same as for a preliminary injunction. *Id.* at 1092. A petitioner must establish that: (1) he is likely to succeed on

---

[7] As the Government notes, Petitioner does not expressly argue his motion for release this way. Rather than arguing for a temporary restraining order pursuant to COVID-19 in the alternative, Petitioner makes an "all or nothing" argument. That is, he asks only for immediate release based on the alleged bond-hearing constitutional violations. As part of his argument though, Petitioner discusses how COVID-19 presents a significant risk of irreparable harm to him and uses this as basis to argue that his petition for permanent release should be granted. Likewise, as part of his irreparable harm argument, Petitioner argues that he is at risk of contracting the coronavirus in detention. The Government rebutted these arguments in its opposition brief. Opp. at 21. Hence, the effect of COVID-19 and its potential impact on Petitioner has been fully briefed. The Government thus has been able to respond to Petitioner's COVID-19 concerns. *See Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 672 F.3d 1160, 1166 n.8 (9th Cir. 2012). Accordingly, while Petitioner has not properly presented his request for temporary release on COVID-19 grounds to the Court, the Court finds that there is sufficient briefing on this subject to determine whether or not Petitioner's temporary restraining order can be granted in part. That is, whether or not the Court can (and should) grant Petitioner a limited (rather than permanent) release. The Court notes that this is proper in light of the emergency situation and inherent exigencies that have accompanied the COVID-19 pandemic. Petitioner's health is of great concern to the Court. The Court notes that the Ninth Circuit has *sua sponte* released an immigrant-detainee pursuant to the COVID-19 pandemic. *See Xochihua-Jaimes v. Barr*, 798 F. App'x 52 (9th Cir. 2020). The Court thus finds that Petitioner has adequately presented this argument for review.

Case No.: 5:19-cv-05191-EJD
ORDER DENYING PETITIONER'S MOTION TO ENFORCE THE COURT'S EARLIER ORDER; GRANTING IN PART PETITIONER'S MOTION FOR A TEMPORARY RESTRAINING ORDER

19

the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20.

The world is in the midst of a global pandemic. As another court in this district recently noted, "[i]n a very short period of time . . . COVID-19 has brought dramatic changes to the country." *Ortuño v. Jennings*, 2020 WL 1701724, at *1 (N.D. Cal. Apr. 8, 2020). In California alone, citizens have been directed to stay at home and to practice social distancing to stop the spread of the novel virus. The Centers for Disease Control and Prevention ("CDC") has likewise advised people to "work from home" and to "put distance between yourself and other people." *Protect Yourself*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited Apr. 12, 2020). Persons with certain medical conditions, like moderate to severe asthma, diabetes, chronic kidney disease, liver disease, and hypertension are significantly more likely to have a severe illness or to die if they contract the virus. *People Who Are at Higher Risk*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited Apr. 12, 2020).

Courts have found that immigrant-detainees may bring a motion for temporary release under 28 U.S.C. § 2241. *See, e.g.*, *Ortuño*, 2020 WL 1701724, at *2 ("Accordingly, the Court finds petitioners may seek, pursuant to § 2241, relief from what they allege are unconstitutional conditions of confinement . . . ." (citing *Workman v. Mitchell*, 502 F.2d 1201, 1208 n.9 (9th Cir. 1974) (stating that federal habeas relief is available to deal with questions concerning both the "duration and the conditions of confinement"); *Thakker*, 2020 WL 1563, at 2 ("[W]e find that Petitioners have appropriately invoked this court's jurisdiction through a 28 U.S.C. § 2241 petition for writ of habeas corpus."); *cf.* Opp. at 21 (arguing that there are no grounds to support a habeas petition on COVID-19 grounds). Accordingly, Petitioner may challenge the conditions of his confinement through a habeas petition.

### 1. Irreparable Harm

Petitioner must first show a "probability of irreparable harm" if relief is not granted.  The risk of irreparable harm must be "*likely*, not just possible."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011); *see also Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (stating that conclusory or speculative allegations are not enough to establish a likelihood of irreparable harm).

The Government argues that Petitioner's concerns that he might contract COVID-19 are merely speculative and that Petitioner is not at any greater risk of contracting or dying from the virus at the Aurora Detention Facility.  Opp. at 21.  As support, the Government points this Court towards the efforts that the facility is taking; namely, that the facility is sanitizing cells and screening, testing, and isolating detainees.  *Id.*  The Government also notes that there is no evidence that anyone at the Aurora Detention Facility has COVID-19.  *Id.* at 22.

These arguments, however, miss the point.  COVID-19 is a highly contagious and novel coronavirus.  *See Thakker*, 2020 WL 1671563, at *4–*5 (discussing the prevalence and seriousness of the virus).  The mere fact that no cases have been reported in the Aurora Facility is irrelevant—it is not a matter of *if* COVID-19 will enter the facility, but *when* it will be detected there.  *See id.* at *3.  Likewise, the structure of detention facilities, which are designed to house multiple people in close proximity, render any sanitation efforts somewhat meaningless as detainees cannot social distance.  This is problematic because social distancing is regarded by many as one of the most important steps of stopping the spread.  *See id.* at *5 (noting that detention facilities are uniquely equipped to transmit the virus due to the close contact of detainees); *see also* Declaration of Jennifer T. Friedman ("Friedman Decl."), Ex. A, Dkt. 25-1 (two medical experts for the Department of Homeland Security wrote letters to Congress warning of the unique dangers COVID-19 poses to ICE detention facilities);[8] *Ortuño*, 2020 WL 1701724,

---

[8] The Government objects to the use of this letter.  *See* Dkt. 27.  The Court finds the Government's objections unpersuasive.  Notably, other courts have relied on these same letters.  *See, e.g.*, Case No.: 5:19-cv-05191-EJD

ORDER DENYING PETITIONER'S MOTION TO ENFORCE THE COURT'S EARLIER ORDER; GRANTING IN PART PETITIONER'S MOTION FOR A TEMPORARY RESTRAINING ORDER

21

at *4 (finding that the petitioners cannot meaningfully follow the CDC's advice to engage in social distancing at all times); *Basank v. Decker*, 2020 WL 1481503, at *5 (S.D.N.Y. Mar. 26, 2020) ("The risk of contracting COVID-19 in tightly-confined spaces, especially jails, is now exceedingly obvious."); *see also Protect Yourself*, CDC, cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited Apr. 13, 2020) ("The best way to prevent [coronavirus] is to avoid being exposed to the virus.").

Moreover, not only does the Aurora Detention Facility, by its shared and confined housing setup, present a risk of spreading COVID-19, Petitioner himself is at an increased risk of contracting and dying from the virus. As noted, Petitioner suffers from asthma, hypertension, and latent tuberculous. Courts across the United States have found that such underlying health conditions coupled with the lack of hygiene and overcrowding present at detention facilities pose a risk of irreparable harm. *See Thakker*, 2020 WL 1671563, at *6–*7 (collecting cases). The risk, in fact, of contracting and dying from the virus has been held to be so severe that it constitutes an irreparable harm that supports the grant of a TRO. *See Basank*, 2020 WL 1481503, at *4–*5. This Court agrees and finds that the risk of irreparable injury to Petitioner, a high risk individual, satisfies the first element of the TRO analysis.

### 2. Likelihood of Success on the Merits

Petitioner next argues that his continued detention at Aurora Detention Facility exposes him to serious risks associated with COVID-19, namely death, which violates his due process rights. *See* Reply at 14–15. Petitioner is likely to succeed on this claim.

To bring a Fifth Amendment due process claim, Petitioner must show that the conditions of his confinement "amount to punishment." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Conditions amounting to punishment occur "(1) where the challenged restrictions are expressly intended to punish, or (2) where the challenged restrictions serve an alternative, non-punitive

---

*Thakker*, 2020 WL 1671563, at *5.

purpose but are nonetheless excessive in relation to the alternative purpose, or are employed to achieve objectives that could be accomplished in . . . alternative and less harsh methods." *See Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004) (internal quotations and citations omitted).

Petitioner does not argue that the Government, by detaining him, is intending to punish him. Rather, the question presented is whether Petitioner is likely to show that, given his health concerns, his detention is excessive in relation to the Government's needs. *See Ortuño*, 2020 WL 1701724, at *3. The Court holds that Petitioner has shown this. Petitioner has demonstrated that he is at a high risk of severe illness if infected with COVID-19. *See* Dkt. 15-10 (stating that Petitioner suffers from asthma [which he requires an inhaler for], hypertension, and latent tuberculosis). As noted, Petitioner cannot practice meaningful social distancing in his detention facility. Pursuant to the Court's above analysis, it is clear that the Government has a non-punitive and legitimate purpose in detaining Petitioner, namely to protect the community. However, Petitioner has made a strong showing that the Government detaining him under the current conditions is "excessive in relation to [that] purpose." *See Ortuño*, 2020 WL 1701724, at *4; *Thakker*, 2020 WL 1671563, at *8–*9. The Government's legitimate concerns can still be advanced by a limited release. *See infra*. Accordingly, because of Petitioner's health risks, the Court holds that Petitioner's detention is excessive in relation to the Government's needs.

### 3. Balance of Hardships/Public Interest

The equities at issue and public interest also weigh in Petitioner's favor. Petitioner is unable to meaningfully limit his exposure to COVID-19 while at Aurora. While the Government's concern about Petitioner being a danger to the community is legitimate, this concern can be addressed by imposing reasonable conditions upon release. Moreover, the public interest in promoting public health is served by efforts to contain the further spread of COVID-19, particularly in detention centers, which are typically staffed by persons who reside in the local communities. *Ortuño*, 2020 WL 1701724, at *4.

Case No.: 5:19-cv-05191-EJD
ORDER DENYING PETITIONER'S MOTION TO ENFORCE THE COURT'S EARLIER
ORDER; GRANTING IN PART PETITIONER'S MOTION FOR A TEMPORARY
RESTRAINING ORDER

### III. CONCLUSION

For the foregoing reasons, Petitioner's motion to enforce the Court's earlier order is **DENIED.** Petitioner's motion for a temporary restraining order is **GRANTED** in part as follows:

1. The Government shall immediately RELEASE Petitioner pursuant to the following conditions of release:

   a. Petitioner shall not consume any alcoholic beverages;

   b. Petitioner is not permitted to drive or operate a motor vehicle; and

   c. Petitioner is to obey all governmental shelter-in-place orders, regulations, and protocols.

2. The Parties are ordered to meet and confer and propose **a date upon which Petitioner will return to ICE custody**. The Parties shall file a joint statement with the Court no later than 12PM on April 15, 2020 detailing these discussions. This date could be set as the date that California's shelter-in-place order expires.

3. This TRO will expire on April 27, 2020. If the Parties are unable to stipulate to a date upon which Petitioner will return to ICE custody, no later than 12PM on April 20, 2020, the Government shall **SHOW CAUSE** why the TRO should not be converted into a preliminary injunction for the duration of the shelter-in-place.

   **IT IS SO ORDERED.**

Dated: April 14, 2020

_____
EDWARD J. DAVILA
United States District Judge